Opinion
 

 TODD, Acting P. J.
 

 A jury found Daniel Joseph Forster guilty of one count of driving under the influence of alcohol in violation of Vehicle Code
 
 [1]
 
 section 23152, subdivision (a), one count of driving while having a blood-alcohol concentration of .08 percent or more in violation of section 23152,
 
 *1750
 
 subdivision (b), and one count of driving with a suspended license in violation of section 14601.2, subdivision (a). In connection with allegations under counts 1 and 2 that Forster’s blood-alcohol content was .20 percent or more (§ 23206.1), the jury was unable to make findings, and the trial court dismissed those allegations. Following the jury verdicts, Forster admitted allegations that within seven years of the commission of the charged offenses he had suffered three prior convictions of driving under the influence within the meaning of section 23175, thus elevating counts 1 and 2 to felonies.
 

 The trial court sentenced Forster to the upper term of three years in state prison for the section 23152, subdivision (a), conviction. The trial court imposed a three-year term for the conviction of section 23152, subdivision (b), but stayed that sentence pursuant to Penal Code section 654. The trial court imposed a 120-day concurrent sentence for the misdemeanor section 14601.2 conviction.
 

 Forster appeals, contending the trial court erred in (1) failing to suppress his statements to a police officer, (2) allowing him to be impeached with his felony conviction without determining that the crime involved moral turpitude, and (3) imposing the upper term sentence.
 

 Facts
 

 On July 29, 1992, the Department of Motor Vehicles suspended Forster’s driving privileges as a result of a conviction of driving under the influence. Forster received notice of the suspension of his license by mail on August 31, 1992. The suspension was in effect on April 3, 1993.
 

 At 9:25 p.m. on April 3, 1993, Forster, driving a Toyota pickup truck, contacted United States Customs Inspector Keith Fleming, who was working the No. 5 inspection lane at the San Ysidro Port of Entry. In response to routine questions by Fleming, Forster said he was coming from Rosarito Beach and was going to an automatic teller machine to obtain money. Because Forster’s eyes were droopy and he was inattentive, Fleming formed the opinion that Forster was under the influence of alcohol. Fleming asked Forster to step out of his vehicle and accompanied him to the customs security office, where Fleming subjected Forster to a routine patdown search and directed him to sit on a bench. As they were walking to the security office, Fleming noticed Forster’s ear was bloody. Forster told Fleming he had been in a fight. Once inside the security office, Fleming contacted the California Highway Patrol (CHP) to investigate the possibility Forster was driving under the influence. Fleming explained to the jury that investigating
 
 *1751
 
 or reporting driving under the influence offenses was not part of the job duties of a customs inspector. He added he asked Forster to step out of the vehicle because he did not believe Forster was in a fit condition to drive and it was a moral judgment on his part.
 

 At 10:20 p.m., CHP Officer Pedro Herrera responded to the customs security office and talked with Fleming. At approximately 10:30 p.m., Herrera contacted Forster and asked him to approach a counter. Herrera observed Forster to be sleepy with red and watery eyes. Herrera also noticed that Forster walked with an unsteady gait and his speech was slurred. Herrera inquired about an injury to Forster’s ear, and Forster said he had sustained the injury in a fight in Rosarito Beach. Forster also told Herrera he was coming from Rosarito Beach and planning to go to an automatic teller machine to get more money. Herrera asked Forster if he had been drinking, and Forster told the officer he had drunk four “Pacifico” beers. Forster told Herrera he had started drinking at 8 that morning and had stopped drinking at 7:30 that evening. Forster also told the officer he last ate at 8:30 the previous day, when he had steak and ham. Herrera conducted a series of field sobriety tests; Forster failed each one. Herrera formed the opinion that Forster was legally intoxicated for purposes of driving and relayed that finding to Fleming, who made a citizen’s arrest.
 

 Herrera transported Forster to a hospital, where he received medical treatment for his ear injury. Herrera then transported Forster to the downtown jail, where blood was taken at 12:32 a.m. on April 4.
 

 An analysis of the blood sample taken from Forster showed he had a blood-alcohol content of .24 percent.
 

 Raymond Cole, a forensic toxicologist, opined that Forster had a blood-alcohol level of .30 percent at 9:30 p.m. based on the 12:32 a.m. blood test results and absorption and burn-off data.
 

 Forster’s friend, Dale Dueling, testified for the defense that he and Forster had departed for Mexico at 1 p.m. on April 3, with Dueling driving Forster’s pickup truck. They stopped for a hamburger before entering Mexico, and, once in Mexico, they went shopping. Dueling bought a bottle of tequila. Dueling testified they returned to the truck and, with Forster driving, were headed toward Rosarito Beach when he noticed a group of interesting shops and asked Forster to stop. They passed a cantina that was offering free drinks at the door to lure customers and they entered the cantina, staying there for two hours. At no point during April 3 did Dueling see Forster consume alcohol. At some point, Dueling got into a fight in the cantina and lost sight
 
 *1752
 
 of Forster. Dueling left the cantina and looked for Forster, but the truck was gone. Dueling went to the toll-free parking lot at the border because the pair had previously agreed that if they became separated they would meet at that location.
 

 Testifying in his own defense, Forster said he joined the fight involving Dueling, which had become a brawl. After he left the cantina, Forster passed out, and when he regained consciousness he realized he was injured. Forster drove to the border where the wait in line for inspection was 45 minutes. During this time Forster was feeling severe pain, and, to alleviate the pain, he drank from the bottle of tequila left in the truck by Dueling.
 

 Richard Whalley, a forensic toxicologist, testified that a person of Forster’s size who consumed a half liter of tequila at 9:15 p.m. within five or ten minutes would have a blood-alcohol level of between .21 and .29 three hours later. Whalley also testified one could not say what that person’s blood alcohol would be at 9:25 p.m. because that person would still be absorbing alcohol and how much alcohol had been absorbed was an unknown.
 

 Cole, the prosecution’s toxicologist, testified that if Forster had consumed alcohol only within the last half hour prior to the customs inspection he would have had to consume 11 ounces of tequila to have tested at a .24 blood-alcohol level at 12:30 a.m. Cole further opined that if this was the only period of time in which Forster had consumed alcohol his blood-alcohol level would have been .14 within 15 minutes of consuming the tequila.
 

 CHP Officer Tom Newman inspected Forster’s vehicle and did not find a bottle of tequila in it.
 

 Forster had suffered a number of prior convictions for driving under the influence, including a 1992 conviction under section 23175, felony drunk driving within seven years of three or more driving under the influence convictions.
 

 Discussion
 

 I
 

 Forster contends evidence of his statements to CHP Officer Herrera was improperly admitted in violation of his rights under
 
 Miranda
 
 v.
 
 Arizona
 
 (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], The contention is without merit.
 

 In
 
 Miranda
 
 v.
 
 Arizona, supra,
 
 384 U.S. at page 444 [16 L.Ed.2d at page 706], the high court held that a person questioned by law enforcement
 
 *1753
 
 officers after being “taken into custody or otherwise deprived of his freedom of action in any significant way” must first “be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” (Fn. deleted.) A defendant’s statements obtained in noncompliance with this rule cannot be introduced into evidence to establish his guilt.
 
 (Ibid.;
 
 cf.
 
 Harris
 
 v.
 
 New York
 
 (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] [statements elicited in violation of
 
 Miranda
 
 admissible on defendant’s credibility].)
 

 Here, the issue is whether Forster was “taken into custody or otherwise deprived of his freedom of action in any significant way.”
 
 (Miranda
 
 v.
 
 Arizona, supra,
 
 384 U.S. at p. 444 [16 L.Ed.2d at p. 706], fn. deleted.) For the reasons that follow, we conclude he was not; therefore, the
 
 Miranda
 
 safeguards do not apply. Custody “ ‘occurs if the suspect is physically deprived of his freedom of action in any way or is led to believe, as a reasonable person, that he is so deprived.’ ”
 
 (Green
 
 v.
 
 Superior Court
 
 (1985) 40 Cal.3d 126,133-134 [219 Cal.Rptr. 186, 707 P.2d 248], quoting
 
 People
 
 v.
 
 Arnold
 
 (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515]; see also
 
 Berkemer
 
 v.
 
 McCarty
 
 (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 336, 104 S.Ct. 3138], fn. deleted [“the only relevant inquiry is how a reasonable man in the suspect’s position would have understood his situation”].) In
 
 People
 
 v.
 
 Lopez
 
 (1985) 163 Cal.App.3d 602, 608 [209 Cal.Rptr. 575], the Court of Appeal listed various objective indicia of custody for
 
 Miranda
 
 purposes: (1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.
 

 With respect to the first criterion, Forster had not been arrested. With respect to the second criterion, we note the detention was a relatively long one, a little more than an hour. However, there is a reasonable explanation for that delay, namely, it took that long for the CHP officer to arrive at the San Ysidro Port of Entry and it was necessary to wait for the CHP officer’s arrival because customs officers do not investigate driving under the influence cases. With respect to the third criterion, Forster was detained in a public area of the customs office; he was neither restrained nor handcuffed in any fashion. Forster sat quietly on a bench and was not addressed by any officer during this interval. With respect to the fourth criterion, the record does not indicate how many customs officials were present in the customs office or if there were other people being detained at the same time as Forster. Finally, with respect to the fifth criterion, we do not discern any overbearing demeanor from either Fleming or Herrera; nor
 
 *1754
 
 does their questioning appear to be compulsive in any sense.
 
 [2]
 
 Thus, we are left with one factor that supports Forster’s position, namely the hour-plus detention. However, in deciding whether the custody issue for purposes of
 
 Miranda,
 
 it is the totality of circumstances that is relevant; “no one factor is dispositive.”
 
 {People
 
 v.
 
 Boyer
 
 (1989) 48 Cal.3d 247, 272 [256 Cal.Rptr. 96, 768 P.2d 610].) And this one factor—length of detention—is rationally explainable here. Therefore, given the absence of objective indicia of arrest and considering the totality of the circumstances, we conclude that while Forster was most definitely detained in the customs office, he was not in custody for
 
 Miranda
 
 purposes.
 

 Forster’s attempts to distinguish this case from
 
 Berkemer
 
 are unavailing. In
 
 Berkemer
 
 v.
 
 McCarty, supra,
 
 468 U.S. 420, 435-440 [82 L.Ed.2d 317, 331-335], the high court concluded that investigatory questioning by a officer pursuant to a routine traffic stop does not implicate
 
 Miranda.
 
 While the delay here is longer than that in Berkemer—or most routine traffic stops, for that matter—the length of the delay was caused by the time it took for the traffic officer to arrive at the San Ysidro Port of Entry. Otherwise, there were no objective indicia of arrest. The fact that Forster was questioned in the customs office rather than at roadside is not a material distinction under these circumstances. (See
 
 Oregon
 
 v.
 
 Mathiason
 
 (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711] [requirement of
 
 Miranda
 
 warnings need not be imposed simply because the questioning takes place in the station-house.]) We conclude under the facts presented here it is factually reasonable to analogize Forster’s detention to a traffic stop. Accordingly, there was no custody for purposes of
 
 Miranda.
 
 There was no error in admitting evidence of Forster’s statements to Herrera.
 

 II
 

 Forster contends the trial court erred in allowing him to be impeached with his prior felony conviction without determining the crime involved moral turpitude. Forster further contends that his prior felony conviction of driving while under the influence in violation of section 23175 is not a crime
 
 *1755
 
 involving moral turpitude. Disagreeing with this second contention, we find no error.
 
 [3]
 

 Initially, we note it appears from the record the trial court incorrectly believed that a defendant can be impeached with any prior felony conviction regardless of whether the prior offense involved moral turpitude. (See
 
 People
 
 v.
 
 Castro
 
 (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].)
 
 [4]
 
 Defense counsel concurred, but the prosecutor urged the trial court to make a finding that the prior offense involved moral turpitude. At the prodding of the prosecutor, the trial court made an equivocal statement, which the Attorney General argues is a finding on moral turpitude. We refer to the following exchange:
 

 “[Prosecutor]: Can the court, just so the record is there in case there are any problems later, indicate that it feels a felony drunk driving is a moral turpitude crime based on the fact that it does indicate a readiness to do evil when a person drives with the knowledge which is inferred from having three prior drunk-drivings?
 

 “[The Trial Court]: Well, it certainly can be argued that someone who has at least three driving-under-the-influence-of-alcohol convictions, who yet again is found in a similar circumstance, is certainly—I hate to use the word evil, that seems a little bit strong, but in the legal sense is acting with moral turpitude.
 

 “What about this? Why don’t I just say in that court’s opinion, a felony conviction equates to acting with moral turpitude, and therefore under Evidence Code section 788 a prior conviction of a felony can be used to impeach a person? But you can’t refer to it as driving under the influence. It’s got to be, ‘Were you convicted of a felony,’ period.” We are not persuaded that the trial court’s ambiguous comment constitutes a finding.
 
 *1756
 
 Nonetheless, we find Forster is estopped from raising the lack of a finding as an issue on appeal because he failed to object below. “Neither this court, nor defendant, can avoid the command of Evidence Code section 353, that ‘A verdict. . . shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: Q] (a) There appears of record an objection to or a motion to exclude or to strike the evidence
 
 (People
 
 v.
 
 Visciotti
 
 (1992) 2 Cal.4th 1, 53, fn. 19 [5 Cal.Rptr.2d 495, 825 P.2d 388].)
 

 In any event, the key issue for us is whether felony driving under the influence with three or more driving under the influence convictions within seven years of the instant offense (§23175) is a crime involving moral turpitude under the prescription of
 
 People
 
 v.
 
 Castro, supra,
 
 38 Cal.3d 301. For the reasons that follow, we conclude it is.
 

 In
 
 People
 
 v.
 
 Mansfield
 
 (1988) 200 Cal.App.3d 82, 87 [245 Cal.Rptr. 800], the Court of Appeal summarized the
 
 Castro
 
 rule:
 

 “Pursuant to
 
 People
 
 v.
 
 Castro, supra,
 
 38 Cal.3d 301, and subject to the trial court’s discretion under Evidence Code section 352, only prior felony convictions that necessarily involve moral turpitude may be used to impeach a witness in a criminal proceeding.
 
 (Id.
 
 at p. 306.) ‘Moral turpitude’ means a general ‘ “readiness to do evil” ’
 
 (id.
 
 at p. 314), i.e., ‘an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.’
 
 (In re Craig
 
 (1938) 12 Cal.2d 93, 97 [82 P.2d 442]; 2 Bouvier’s Law Dict. (3d rev. 1914) p. 2247; 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 375, pp. 424-426; see also Annot. (1975) 23 A.L.R. Fed. 480, 488 involving exclusion or deportation of aliens under Federal Immigration and Naturalization Act.)
 
 Castro
 
 makes no attempt to list or define those felonies which involve moral turpitude, but it makes clear that moral turpitude does not depend on dishonesty being an element of the felony. ‘[I]t is undeniable that a witness’ moral depravity of
 
 any kind
 
 has some “tendency in reason” (Evid. Code, § 210) to shake one’s confidence in his honesty.’
 
 (People
 
 v.
 
 Castro, supra,
 
 38 Cal.3d at p. 315; original italics.)
 

 “Finally,
 
 Castro
 
 holds that in deciding whether a felony offered for impeachment necessarily involves moral turpitude, the trial court may look only to the ‘least adjudicated elements’ of the crime for which the witness was previously convicted.
 
 (Id.
 
 at p. 317.) This concept simply means that in determining whether a previous felony involves moral turpitude the court cannot go behind the conviction and take evidence on or consider the facts
 
 *1757
 
 and circumstances of the particular offense. Instead, the court must look to the statutory definition of the particular crime and only if the least adjudicated elements of the crime necessarily involve moral turpitude is the prior conviction admissible for impeachment purposes.
 
 (People
 
 v.
 
 Statler
 
 (1985) 174 Cal.App.3d 46, 53 [219 Cal.Rptr. 713].)”
 

 A violation of section 23175 requires that a person be convicted of driving under the influence (§ 23152) and that the offense occurred within seven years of three or more separate violations of driving under the influence. Thus, we are discussing a recidivist type crime involving an extremely dangerous activity. Having suffered at least three previous convictions for driving under the influence, a person who has violated section 23175 is presumptively aware of the life-threatening nature of the activity and the grave risks involved. (See
 
 People
 
 v.
 
 David
 
 (1991) 230 Cal.App.3d 1109, 1114-1115 [281 Cal.Rptr. 656].) Continuing such activity despite the knowledge of such risks is indicative of a “conscious indifference or T don’t care attitude’ concerning the ultimate consequences” of the activity
 
 (People
 
 v.
 
 Ochoa
 
 (1993) 6 Cal.4th 1199, 1208 [26 Cal.Rptr.2d 23, 864 P.2d 103]) from which one can certainly infer a “ ‘depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man.’ ”
 
 (People
 
 v.
 
 Mansfield, supra,
 
 200 Cal.App.3d at p. 87; accord,
 
 People
 
 v.
 
 Bautista
 
 (1990) 217 Cal.App.3d 1, 7 [265 Cal.Rptr. 661] [felony hit-and-run driving (§ 20001) found to involve a “ ‘general readiness to do evil’ or moral turpitude”]; see also
 
 People
 
 v.
 
 Ballard
 
 (1993) 13 Cal.App.4th 687, 697 [16 Cal.Rptr.2d 624] [felony indecent exposure (Pen. Code, § 314, subd. 1) involves moral turpitude, noting recidivist nature of offense].) Accordingly, we conclude a violation of section 23175 involves moral turpitude within the meaning of
 
 Castro.
 

 Forster’s reliance on
 
 In re Carr
 
 (1988) 46 Cal.3d 1089 [252 Cal.Rptr. 24, 761 P.2d 1011], in which misdemeanor driving under the influence was determined not to involve moral turpitude, and on language in
 
 Ostrow
 
 v.
 
 Municipal Court
 
 (1983) 149 Cal.App.3d 668, 675-676 [197 Cal.Rptr. 40], which discussed the nature of section 23152, subdivision (b), is misplaced.
 
 In re Carr, supra,
 
 46 Cal.3d 1089, a State Bar disciplinary case involving an attorney who pled no contest to two counts of driving under the influence, is distinguishable on two points. First, it involved misdemeanor driving under the influence, not the felony driving under the influence with three prior convictions of driving under the influence. Second, attorney disciplinary cases are not determinative on the issue of moral turpitude for purposes of a
 
 Castro
 
 analysis. (See
 
 People
 
 v.
 
 Armendariz
 
 (1985) 174 Cal.App.3d 674, 682 [220 Cal.Rptr. 229].)
 
 Ostrow, supra,
 
 149 Cal.App.3d 668, involved a multiprong constitutional attack on section 23152, subdivision (b), which at that
 
 *1758
 
 time prohibited driving with a blood alcohol of .10 percent or more. Again, this is an offense that is markedly different from Forster’s prior conviction under section 23175. Moreover, the discussion in
 
 Ostrow
 
 (at pp. 675-676), upon which Forster relies, did not deal with moral turpitude; neither moral turpitude nor
 
 Castro
 
 was involved in any aspect of the case.
 

 Ill
 

 Forster contends he is entitled to a new sentencing hearing as the trial court erred in imposing the upper term by (a) improperly making dual use of facts in considering Forster’s prior drunk driving convictions and (b) improperly relying on “planning” as an aggravating factor. The contention is without merit.
 

 We begin by noting that a single valid factor in aggravation is sufficient to justify the imposition of the upper term.
 
 (People
 
 v.
 
 Castellano
 
 (1983) 140 Cal.App.3d 608, 615 [189 Cal.Rptr. 692].)
 

 Here, the trial court gave three reasons for imposing the upper term: (1) the manner in which the crime was carried out indicates planning on the part of the defendant (Cal. Rules of Court,
 
 [5]
 
 rule 421(a)(8)); (2) defendant’s prior convictions as an adult are numerous and increasing (rule 421(b)(2)); and (3) defendant’s performance on probation for the same type of offenses has been unsatisfactory (rule 421(b)(5)).
 

 Forster first complains the trial court’s use of his prior convictions as an aggravating factor was improper because those convictions are what made his offense a violation of section 23175. Forster correctly points out the law prohibits dual use of facts by a sentencing court. A sentencing court may not rely on the same fact to impose a sentence enhancement and the upper term. (Pen. Code, § 1170, subd. (b); rule 420(c).) Nor may a fact constituting an element of the offense be used to impose the upper term. (Rule 420(d).) However, the elevation of the driving under the influence offense to a felony under section 23175 required only three prior convictions of driving under the influence. Forster had more than three prior driving under the influence convictions; the probation report lists at least seven prior driving under the influence convictions. Thus, there was a surplus of pertinent prior convictions sufficient to establish a violation of section 23175 as well as to constitute a valid factor in aggravation, without the purported overlapping or impermissible dual use of facts claimed by Forster.
 

 Forster next attacks the planning factor utilized by the trial court in imposing the upper term, arguing there was no evidence of planning. We
 
 *1759
 
 disagree. As the trial court stated, planning on Forster’s part was indicated by the fact he went to Mexico for the specific purpose of partying and he consumed a large amount of alcohol, as verified by his .24 blood-alcohol content. This was a reasonable interpretation of the evidence presented at trial; after all, the jury did not accept Forster’s defense of medical necessity, namely, that he drank only to deaden the pain of his ear injury.
 

 Finally, Forster has not questioned the use of his inadequate performance on probation as a valid factor in aggravation. We find no basis to do so. (See
 
 People
 
 v.
 
 Lewis
 
 (1991) 229 Cal.App.3d 259, 268 [280 Cal.Rptr. 128].) Accordingly, even if the trial court made impermissible dual use of Forster’s prior convictions and impermissibly used planning as an aggravating factor, there remains one unassailable valid factor in aggravation. As we stated earlier, a single valid factor in aggravation is sufficient to justify an upper term.
 
 (People
 
 v.
 
 Castellano, supra,
 
 140 Cal.App.3d 608, 615.) Hence, even if we were to find merit in Forster’s sentencing assignments of error, any such error is harmless and no remand is required. (See
 
 People
 
 v.
 
 Dreas
 
 (1984) 153 Cal.App.3d 623, 637 [200 Cal.Rptr. 586].)
 

 Disposition
 

 Affirmed.
 

 Huffman, J., and Nares, J., concurred.
 

 [1]
 

 All statutory references are to the Vehicle Code unless otherwise specified.
 

 [2]
 

 We note the questioning of these officers was rather routine. As the high court made clear in
 
 Miranda
 
 v.
 
 Arizona, supra,
 
 384 U.S. 436, 477 [16 L.Ed.2d 694, 725], the intent behind the rule is not to hamper the traditional role of police in investigating crime. “General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.”
 
 (Ibid.)
 
 The questions posed by Herrera were designed to determine if further investigation into a possible driving under the influence offense was required.
 

 [3]
 

 It is important to note that the trial court sanitized (see
 
 People
 
 v.
 
 Mickle
 
 (1991) 54 Cal.3d 140, 172 [284 Cal.Rptr. 511, 814 P.2d 290]) the prior felony conviction for purposes of impeachment and allowed the prosecution merely to ask Forster whether he had suffered a prior felony conviction.
 

 [4]
 

 In
 
 Castro,
 
 the California Supreme Court held that a prior felony conviction may be used for purposes of impeachment “which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty.” (38 Cal.3d at p. 306.) Noting “moral turpitude” is broader than dishonesty, the Supreme Court said any felony that shows a “ ‘readiness to do evil’ ”
 
 {id.
 
 at p. 314) or “necessarily evince[s] any character trait which can reasonably be characterized as ‘immoral’ ” is relevant
 
 {id.
 
 at p. 317, fn. 13). The Supreme Court reiterated the threshold requirement of moral turpitude in
 
 People
 
 v.
 
 Wheeler
 
 (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938]: “Of course, the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.” (Fn. omitted.)
 

 [5]
 

 All subsequent rule references are to the California Rules of Court.